The next case on our docket is 21-40680, the State of Texas versus the United States. Mr. Boynton. Good morning, Your Honor, and may it please the Court, Brian Boynton for the United States have reserved four minutes for rebuttal. The 2012 DACA memorandum challenged in this case is lawful in its entirety and should be upheld. This Court should reverse the District Court's grant of summary judgment for the plaintiff's states and vacate the injunction against DACA. I'd like to start first with standing. The plaintiffs have failed to meet their burden of establishing Article III standing. This case is very similar to the Crane v. Johnson case decided by this Court, where the Court found that Mississippi had failed to meet its burden to establish standing. Mississippi, like the plaintiffs here, was resting on an assertion that DACA caused the state to spend more for social services generally, but Mississippi had not put in any evidence showing that DACA specifically caused the state to increase its expenditures. This Court found standing to be purely speculative in that case and rejected Mississippi's challenge. Importantly, Mississippi, like the plaintiffs in this case, had not relied on expenditures due to the issuance of driver's licenses, the basis for standing in this Court's 2015 DACA decision. This case is also very similar to the recent decisions by the Sixth Circuit in the immigration priorities cases. There have been two recent decisions by the Sixth Circuit, both by Judge Sutton. The second one issued just yesterday. This is a case where the plaintiff states have challenged a DHS memo setting immigration enforcement priorities. The states there, like the states here, contend that the guidance about how to remove people from the United States causes the states to spend more money on social services. The Sixth Circuit concluded that the plaintiff's basis for standing was entirely speculative. It's important that in this case the plaintiffs have— Do you think your best case on standing is Crane v. Johnson? Yes, Your Honor. The 2015 case? Yes, Your Honor. The Sixth Circuit decisions are also quite helpful. Because I'm looking at your brief, you don't really talk about that case. Crane v. Johnson, I believe we cited, we don't focus on it. That's part of the reason I wanted to— You don't mention it anywhere in your standing discussion. The argument we've made, Your Honor— I'm not saying it's waived. It's just kind of surprising that your lead case isn't even in your brief. Your Honor, the argument we made in our brief is very similar to the argument accepted in Crane v. Johnson. I take your point that we didn't focus as much on it. But the argument we made was that it's the plaintiffs that failed to put forward evidence documenting their expenses. The approach the plaintiffs took here is very different from what they did in the DAPA case. There, this Court relied on driver's license expenditures. That was important because under Texas law, Texas issued driver's licenses to people who were granted deferred action. That's not the case with respect to the expenditures that the plaintiffs are pointing to here. They're pointing to emergency medical care expenses. Well, I'll agree with you that it's interesting that the State doesn't make that argument here. It would have been easy for us to just follow our previous ruling in the DAPA case. I'm sure we'll ask the State of Texas that question when they're up here. But do you doubt that there's a similar injury in this case? Wouldn't it be when you have the same driver's license problems with the DACA population as we do with the DAPA population? So we don't have any evidence in the record— In other words, is your argument just purely a forfeiture argument, or do you think it's actually factually different? There's a forfeiture argument, and I don't know factually whether the argument would be the same or not. It would depend on expenses incurred by the States here. But the bottom line for us is that the States haven't raised this issue and have forfeited it. Because of the way the plaintiffs have attempted to show standing, they necessarily have to show that DACA causes more people to be in the United States, and that if DACA were rescinded, these people would voluntarily leave the United States. That's the only way they get to a decrease in expenditures. And they've not made that showing. They have not put in any credible— You all had. That's the Wong survey. They didn't need to have the evidence, because—I'm not saying it was the United States. I think it was New Jersey. Right. Correct. They don't need to present evidence when you guys present it for them. So the interveners also presented evidence that the Wong survey is not dispositive on        It's dispositive. It's dispositive. It's dispositive. It's dispositive. It's dispositive. It's dispositive. At the end of the day, interestingly— Well, wait a minute. But it's causing the beneficiaries to speculate on their own behavior if DACA were to be repealed. That's the whole question that you're proposing, right? I think you literally said nobody would leave, and the survey says some 20 percent of the people would leave. Why is that not directly responsive? Because even there, it's speculative about what people would do. This was a survey conducted five years ago that asked people to hypothesize what would happen. So it's necessarily speculative. What are the experts on the other side doing but speculating? The experts— In other words, the experts speculate as to what other people do. The survey, I suppose, speculates on what the survey recipients themselves do. If we're going to rely on anything, wouldn't we rely on the people themselves? The district judge looked at the evidence on both sides, Your Honor, both the survey as well as the evidence put in by the interveners on the other side, and the district court concluded that there was a dispute of fact as to whether DACA recipients would in fact leave the country. The court then went on to grant summary judgment. So in your view, how would the state satisfy this? If it's too speculative for the beneficiaries themselves to say that they would leave, then I assume, before it's your eye, it's even more speculative for an expert to say what some other person would. It seems like you're saying there's just no way for there ever to be standing in a case like this for a state. I think it's very difficult for a state to try and establish standing in this way. And this is the point that Judge Sutton makes in the Sixth Circuit decision about how inherently a question like this calls for speculation. But even if the states could— What's more speculative, the theory of standing and causation here or the theory of causation in Massachusetts v. EPA? So I think this one is more speculative, Your Honor, than that one. Because there's just no way to know—you're talking about a population here, the DACA recipients, with deep ties to this country. They've been continuously residing in the country since 2007 and are enmeshed in their communities. And so the prospect that they would just voluntarily leave the country is quite speculative. Even if it weren't, and even if the court were to conclude and the district court were to have concluded that some DACA recipients would leave, the court failed to take into account another aspect of the health care expenditure issue. The court didn't take into account the fact that DACA causes recipients to have private insurance at greater rates than they would otherwise. And having private insurance offsets the same health care costs that the state pointed to. So what's your theory, then, as to why, despite those reasonable points that you're making, 22.3 percent of this 3,000 or so population of survey recipients nevertheless said that they were likely or very likely to leave in the event of repeal? It's hard to know, Your Honor. The interveners put in evidence that the way the questions were structured led people to be predisposed to answer in that way. But at the end of the day, it's almost impossible to know what would happen. Okay. I mean, I'm familiar, you know, when you have political polling and push polls and how you order questions can affect the response rate when we're talking about questions about political beliefs and whatnot. This is a question about literally your entire life. Right? As you say, you know, these people who are accustomed to living here, this is a pretty profound question for them to get wrong. I think that's basically your theory, that they answered this question about their own lives incorrectly. I don't know that it's saying that they got it wrong. The question necessarily calls for speculation, hypothesization about what someone would do. And for that reason, we believe it's too speculative. I'd like to pivot, if I could, to the merits. And I'd like to jump to the substantive APA claims. The Supreme Court in Regents made very clear that when you're evaluating DACA, it is important to look at the component parts of DACA. The premise of the Court's decision in Regents was that DHS failed to consider that it could have moved forward with a program of forbearance only, that there was not a legal impediment to a program of forbearance. We think that's very well established, that the forbearance— I'm using the term forbearance, but this isn't a case that's entirely about forbearance. This isn't a prosecutorial discretion case. There are certain—in fact, we just made reference to it. You were talking about the medical insurance. Certain rights that come with employment and whatnot that are in addition to a simple forbearance decision. Isn't that correct? That makes a difference. That is correct, Your Honor. This is not a case entirely about forbearance, but it is partially and in large measure about forbearance. And I plan to talk about the different components of DACA, but I think it's helpful in considering the lawfulness of DACA to think about the lawfulness of each component part. And so I'd like to start with forbearance and then turn quickly, if I could, to other aspects. The forbearance aspect of DACA is simply a form of prioritization. DHS has limited resources. It's unable to remove 11 million people in the country. It has to decide who it's going to target first. It has some priorities that say these people are high priorities. Deferred action is a way of saying other groups of people are very low priorities. It's well established that agencies can exercise this kind of discretion in the face of limited resources. And the statute specifically gives the DHS Secretary authority to establish immigration enforcement priorities. That's Section 202.5 of Title VIII. And then the Supreme Court's decision in Regents also makes this quite clear. More broadly, the Supreme Court has recognized that deferred action is an authority that DHS has exercised for many years. The 1999 decision in Reno v. American Arab Anti-Discrimination Committee notes that DHS had, this was 23 years ago, at that point DHS had been engaged in deferred action for quite a long period of time. Additionally, there are numerous statutes within the INA that make reference to deferred action, including the Real ID Act, which necessarily recognizes that deferred action is a form of action DHS can engage in because it says that states can issue driver's licenses to people who have deferred action. So with that, let me pivot to work authorization, which is a critical aspect of DACA. Work authorization is authorized expressly by regulation and by statute. In 1981, INS promulgated a regulation. It's now 8 CFR 274A.12C14 that says that deferred action recipients generally, not DACA specifically, deferred action recipients can seek and obtain work authorization. The light blocks my red light here, Your Honors, so I see that the red light has gone off. I'm happy to continue to answer this, finish this question or to sit down. Well, I gather you have quite a list there. You've saved some time for rebuttal. Okay. We have others to present arguments on your side. Okay.  May it please the Court. Nina Perales for DACA recipient appellants. I will use my time to discuss standing and make two main points. First, the district court committed reversible error when it entered summary judgment in favor of plaintiffs after concluding that the facts related to standing were in dispute. Second, Texas 1, the DAPA case, does not control the outcome here because the evidence of injury in fact and causation offered by Texas is qualitatively different here and does not rise to the level of that in Texas 1, the DAPA or parents case. In its summary judgment opinion, the district court found that defendant interveners' contrary evidence related to plaintiff's standing created a factual dispute. For this reason, this court should reverse and remand for the district court to determine its jurisdiction. This would be after a trial. The district court observed that the contrary evidence creates . . . I have a question about it. You say you can't determine standing until after a trial. I thought there were cases that say it's colorable basically. You proceed with the lawsuit and that standing, you don't know what to the very end based on ultimate fact that you decide their standing. So, Your Honor, a couple of answers to that. Lujan tells us that the burden to show standing gets more difficult, right? This is not a preliminary injunction case. This is actually cross motions for summary judgment. The district court improperly relied on cases in which the plaintiffs were fending off or were the non-movants in summary judgment, right? And so the plaintiff's burden, when they are the non-movants, is to place these issues in the realm of disputed facts. But here, the court entered summary judgment against us, recognizing that we had placed the facts in dispute. The only way that plaintiffs properly get summary judgment in their favor on standing at this stage is if we do not put the facts in dispute. But the court's own words say that we have disputed facts. At ROA 25195, the court says we created a fact issue when the evidence is viewed in favor of the defendant intervenors who were the non-movants for the purpose of this motion. The court also ruled in its denial of our Daubert motion, which was the same day that the court issued its summary judgment decision in 2021, the court said when denying our Daubert motion, that cross-examination is the appropriate means to probe experts' evidence and that our criticisms go to the weight of the expert testimony. Perhaps you're going to get to it, but didn't the court find standing on a few different grounds, not simply the disputed grounds that you're referencing? No, Your Honor, it did not. The court found that the disputed standing facts were those that we contend are material. That is, injury in fact, whether DACA recipients affect or injure Texas by distorting the labor market. That was one disputed fact found by the court. The other one is traceability, causation, and redressability, whether DACA recipients would leave the country if they lost their DACA. These were facts that the court itself found to be in dispute, and the Daubert language that it used is at ROA 25159. It was error for the district court to rely on the disputed facts to deny our motion for summary judgment, but then grant the plaintiff's motion for summary judgment. If there are disputed facts, then the court may have properly denied our motion for summary judgment, although we contend it did not. But the step further to grant the plaintiff's motion for summary judgment on standing was error here. Judge Ho wrote two weeks ago in Garza-Flores v. Mayorkas, the physical present citizenship case, that at the summary judgment stage, the court is obliged not to weigh conflicting evidence, assess the credibility of affidavits, or attempt to reconcile the conflicting evidence. After the court recognized that these standing facts were in dispute, it could not then go further and weigh the conflicting evidence, which is either what the court did improperly was make these determinations on its own, or in the alternative, the court was using the wrong standard, and it was using the preliminary injunction standard where you just have to sort of get these facts out there with some evidence, but you don't have to show that there's no genuine issue of material fact, which is the situation that we have here. With respect to labor market distortion. One difference, of course, about this case is you've got the Massachusetts v. EPA framework, right? That's very different from an individualized plaintiff. It certainly is, Your Honor, and if you're referring to special solicitude, special solicitude adds to the list of the types of injuries that a state could show, right? That's a way to get standing is to show, for example, that. And not just that, but then a dramatically reduced traceability and redressability analysis that individuals would have to prove. Even if it is reduced, Your Honor, there still has to be injury in fact. Massachusetts pointed to the erosion of its beaches. Here, the fact whether there was injury of fact was the disputed fact, right? The allegation was labor market distortion as a result of DACA recipients in Texas who are less than one-third of 1% of the Texas population getting work authorization and becoming employed. But the district court itself found that there was a fact dispute whether there was labor market distortion. The district court concluded only that there was the existence of a larger eligible workforce, but that didn't mean that there was any injury to Texas. And just to quote Judge Sutton from Arizona v. Biden, the district court did not connect the dots between the larger workforce and any injury to the workers. We're six years in to DACA at the time that the summary judgment motions were filed, and because of that, it was incumbent on Texas to get that fact into dispute by showing either an effect on the workforce at large or an effect on any employer or any employee. And it did not. There was no evidence of that. I would like to say just to use my last few seconds, with respect to pocketbook injuries, with respect to health care costs and also social services education, Texas provided no evidence that DACA increased the use of state services. The court did recognize, however, that DACA recipients who had been here since 2007, if there was any evidence that a DACA recipient had used an education dollar or a social service dollar, which there was not in this case, that that would be because they had been here anyway. So again, California v. Texas, a complete lack of traceability. The last point that I'd like to make with the court's indulgence is that Dr. Perryman, who was our expert and which Texas says measured social service costs, did not. He testified he was not aware of any costs to the state of Texas as a result of DACA and that he provided no evidence of such costs in his offset analysis. He simply did not testify to costs. Thank you, Your Honor. I do not want to pronounce your name, so I'm going to let you tell us. It's Jeremy Feigenbaum for New Jersey. May it please the court, with my limited time this morning, I'd like to focus our attention on an independent error by the district court, the vacater of the 2012 memorandum. Texas chose not to file a pre-enforcement lawsuit in this case and to instead challenge DACA only years after the policy issued. That choice matters. Now that we're a full decade later, eliminating DACA would cause extraordinary disruption for recipients, employers, their citizen children, and states. And on these extreme facts, remand without vacater was appropriate instead. I'll begin with that disruption, which this court's cases, I think, teach, is a central component of the vacater inquiry. So the first point is the reliance interest. Obviously the Supreme Court and regents went into some detail about the reliance interest that have developed based on DACA and its existence for now 10 years. And there are a number of examples in the record. So it's not just about the recipients. It's also about the businesses that have employed DACA recipients. DACA recipients have valid employment authorization documents that they present to the businesses. The businesses train them, hire them, sometimes in hard-to-fill roles. And having vacater upon a final judgment would work extraordinary hardship to businesses, as well as the military, as well as public employers like the state of New Jersey, who've been counting on DACA recipients to serve as our doctors, to serve in our armed forces, et cetera. Those are the sorts of interests that regents identify and that I think go to the heartland of the disruption inquiry that's a core part of what this court has looked at repeatedly in cases like Texas Association of Manufacturers, cases like Southwest Services, and so on. The stay that the district court issued does not resolve the issue of whether vacater would be appropriate. The stay that the district court issued pending appeal simply potentially pushes off a deadline in which that we'll have that sort of disruption. So the moment there's a final judgment, if the vacater were to hold, the moment there's a final judgment, we would have an individual serving in the armed forces who's a DACA recipient on a Monday who'd no longer be able to serve there on a Tuesday. That's the sort of disruption that a post-enforcement challenge like this can engender, and that's the sort of challenge that I think the district court nowhere grappled with in its order. I think to its credit, the district court grappled with a number of these reliance interests and equitable interests in crafting its stay pending appeal. But at no point in deciding on the remedy of vacater and in deciding on the remedy of nationwide injunction did the district court expressly or, from my perspective, even implicitly, consider these sort of equitable considerations. And I think that that choice ultimately matters because it's on the district court in the first instance to consider these sorts of questions like the disruption that will be wrought or the appropriate scope of relief in the case. And the district court did none of that in this unusual sort of ten years later challenge that we're facing. One of the questions that comes up, of course, in remand without vacater is whether there are available options to the agency on remand. I think that the D.C. Circuit's opinion by then Judge Kavanaugh in E.M.E. Homer is the most instructive on this score. In that case, the D.C. Circuit found that there were substantive violations by the EPA about the emissions limits that it had imposed on a number of states under the Clean Air Act. And despite making a finding about the substantive invalidity of the limits, then Judge Kavanaugh's opinion for the court specifically said that remand without vacater would be appropriate anyway on the basis that there were some options still available to the agency even if the particular choice of what the agency had done was unlawful. And I think as the United States was beginning to talk about, there are all range of options still available to the United States in this case, including many that regents particularly identified, whether that comes to forbearance or, as the proposed rulemaking indicates, decoupling forbearance with aspects of work authorization but still including work authorization or taking into account particular reliance interests at the level of the agency. These are all options still available to the agency on remand, and vacater would lead to an extraordinary disruption, including to forbearance, including to ongoing employment, including to reliance interests, that only remand without vacater I think properly achieves. And so when the Supreme Court says in regents that whatever the court's view of the merits, that's just the beginning of the remedial inquiry because ultimately it's for the agency to make the important remaining policy choices, I do think that that's the sort of thing that justifies remand without vacater. And it's not every day you see a Supreme Court opinion acknowledging the very reliance interests that we're talking about in this very case, but I think that that has real force and impact in this case. The other point I would make is if this Court's not prepared to outright say that remand without vacater would be the appropriate remedy at the end of the case, the Court should still vacate the remedial order that was issued below and remand that. There are a number of different issues that have arisen on appeal about the scope of that remedial order. So there have been, I think, 28 jail letters flying back and forth between Texas and the United States about the scope of Aleman-Gonzalez and the recent decision in Biden versus Texas. And I don't think I can say it much better than Justice Barrett did in her dissent where she said in Biden that a number of these questions are hard and as a court of review, not first view, these are the sorts of issues you'd want the court that actually issues the remedy to think about in the first instance. And only vacating the remedial order and remanding that to the district court allows Judge Haynen in the first instance to consider the import of Aleman and its application to this case. And if this court does take that step, then I think there are two additional things it should ask the court to do. It should ask the court specifically to consider the disruption that the district court never considered and it should require the court to make the usual findings under the normal four-part test about scope of remedy, particularly given Judge Sutton's recent concurrence in Arizona versus Biden, which really emphasizes some of the questions the district court needs to think about. And I see my time has expired. Thank you, Your Honors. Mr. Stone. Good morning, Chief Judge Richman, and may it please the court. In 2015, this court held that DAPA and extended DACA violated the APA. DACA was the foundation for those programs. This court should come to the same result. I've heard the panel discussing standing, the summary judgment standard, and what's in the record that sort of supports Texas's standing to begin with, so I'd like to start there. The relevant question here for summary judgment is whether or not, first, there is sufficient evidence in the record that Texas has met the constitutional minimum of standing, which is to say that we've shown at least a dollar of expenditures that would be remedied by the removal of DACA, and, in fact, whether we've shown that some individual who receives that sort of spending under DACA will leave the United States. Those are the two propositions that if there are, in fact, sufficient evidence in the record, and there is no evidence showing that either of those numbers are zero, for which summary judgment on standing is appropriate for the plaintiff states. There's plenty of evidence for each. Speaking first about Texas's expenditures under DACA, both sides submitted evidence totaling in the hundreds of millions of dollars of costs that Texas spends on health care alone. So to begin with, Monica Smoot, one of Texas's experts, just looking at three Medicaid programs, estimated approximately over $100 million for each of five separate fiscal years. Ray Perryman, intervener's expert, identified $250 million of costs attributable to Texas expenditures on DACA recipients, and to be very clear, he specifically said that those costs were incurred in part by the state of Texas because of DACA recipients. That's in the record at pages 14304 to 05. So when my friend on the other side says that their expert never attributed those costs to DACA recipients in specific, that's simply flat wrong. Additionally, talking about the evidence in the record showing that some DACA recipients would leave the state, some of the approximately 115,000 appears to be the number the sides agree on. DACA recipients would leave the state. There is, as Your Honors pointed out, a survey conducted by an expert by the appellants indicating that 22.3% of individuals who had DACA describe themselves as likely or very likely to leave. Another 27.1% said they were neither likely nor unlikely. There are 23 declarations by the interveners using materially similar language describing the effect of DACA on their ability to live in the United States, where they all say that it is critical to their ability to live and work in the United States. An ordinary person who describes something as critical to their ability to live somewhere undoubtedly is saying something like, but for this thing it would be very unlikely that I could continue to go on. If I said that my oral argument preparation folder here was critical, you'd think I'd be highly impaired without it. So 23 declarations to that effect, again submitted by appellants. And then, of course, the Texas State Demographer observed in his expert capacity that it would be reasonable for someone to conclude that at least some DACA recipients, if DACA were enjoined or otherwise no longer available, would leave this state. There is nothing in the record that suggests the number of DACA recipients would be zero. That is what would be a genuine issue of material fact because, again, the constitutional minimum quantum for standing here is a dollar of spending that would be remedied by the injunction of DACA. There is no material fact here. If the Court doesn't have any questions on standing, I'm happy to move on to my merits arguments. Why didn't the state of Texas make the same argument that was embraced in the DAPA precedent? Candidly, Your Honor, I can't speak as to the litigation strategy that the trial lawyers chose regarding this below. Of course, as a factual matter, and I'm not raising this to you now, as a factual matter, undoubtedly, the driver's license expenditures still exist, but these hundreds of millions of dollars of costs which both sides expert directly attribute to DACA recipients plainly are constitutionally sufficient as well. I mean, and to the extent there even were some sort of causal question, this Court's decision in Texas DAPA regarding special solicitude plainly suffices. For the same reasons in Texas DAPA as the states had special solicitude, we have both a procedural right to challenge the act in question, the same procedural right, in fact, an APA challenge, and a quasi-sovereign interest, namely the interests that Texas and the other states surrendered to the Union in being able to pass and enforce their own immigration laws. So, again, just comparing this as a benchmark to Massachusetts v. EPA, where the standing sort of chain of causation they were approved of was that if EPA regulated carbon, individuals would buy lower-emitting cars, which would reduce domestic emissions, global emissions, and then preserve Massachusetts' coastline. The evidence in this record is far more concrete, the chain is far shorter, and far more robust. So turning forward to the merits arguments, the merits arguments in this case are easy precisely because they're almost to the individual provision controlled by Texas DAPA. The federal government relies on three statutory provisions that they say give the secretary the unbounded authority to create what in Regents the Supreme Court called an affirmative program for affirmative immigration relief, not merely a forbearance policy, but a program for affirmative relief. They rely on three statutory citations, which are the exact same citations and sections that this Court enumerated and rejected in Texas DAPA. Those no more authorize the secretary to create a power, to have the power to create DACA than DAPA. They then turn to a variety of acts of sort of enforcement history or enforcement discretion, basically past practice. This Court in Texas DAPA said explicitly past practice does not create power in the executive. Then it turned to those past examples, specifically including family fairness upon which the federal government relies so heavily, and says, well, these other programs, including family fairness, they tended to be for specific geographic areas when response to disasters were limited in some way like that, and that family fairness was at least interstitial to an already existing statutory scheme for family reunification visas. This Court rejected the comparison of family fairness to DAPA because as of 2015, it had noticed that Congress had rejected the DREAM Act repeatedly. Here we are seven years later. Congress has rejected the DREAM Act in every Congress since that's been proposed. To the extent there's a comparison between the two programs based on those two criteria, DACA is a much easier case because of the intervening rejections Congress has made regarding something along the lines of the DREAM Act or some statutory basis for DACA. And to turn just briefly, because it came up towards the end, about the section 1252F1 question presented in Biden v. Texas, this Court need not be disturbed by that for at least two reasons. First, I'll get to the merits. The merits reason is 1252F1 only limits a court's power to issue injunctive relief enjoining or restraining the operation of Part IV of Subchapter 2. Part IV of the INA and Subchapter 2 are provisions related to removal, deportation, things of this nature. Texas and the plaintiff states in Complaint Paragraph 10 expressly disclaimed they are not seeking relief that requires the executive to deport, remove, or otherwise take any sort of offensive immigration action against a particular individual. The district court's permanent injunction specifically noted that for clarity, that it was not obligating the federal government to do that either. Beyond that, beyond the fact that that's not what sort of the gravamen of our challenges or challenges that nothing in the INA provides this affirmative power, the things that we complain about are the sort of obviation of the unlawful presence bar and the giving of lawful presence. That section occurs in Part II. The illegal granting of the authorization to work, that's in Section 1324A. That occurs in Part VIII. So they're simply outside the scope of 1252F1 on its own terms, and more fundamentally. The United States appellants, at minimum, were on notice of the potentiality for this issue, 1252F1, when the court in Alam and Gonzalez added that question presented in August of 2021. They did not raise it in their opening brief before this court, much less the district court, even though they cited 1252G, the very next provision. They did not raise it in their reply brief in March of this year, and instead they waited to raise it in a 28-J letter filed after the close of business the Friday before a holiday weekend before a oral argument. This court doesn't address issues raised for the first time in reply briefs, let alone in 28-J letters. So because the one thing we know from Biden v. Texas is that 1252F1 is not a subject matter jurisdictional provision, it can be waived like anything else, and the United States and other appellants have simply forfeited it here. Because of that forfeiture, this court simply doesn't need to address it, let alone remand to the district court for first application. If there are no further questions, I'm happy to see the balance of my time, but I won't give it up to you. If there's anything I can say to be useful. Thank you. Thank you, Your Honor. Let me resume where I was discussing before with work authorization. So there's a 1981 regulation that expressly authorizes deferred action recipients to seek work authorization. Five years later, Congress comprehensively considered employment of undocumented non-citizens in IRCA. It prohibited employers for the first time from knowingly hiring unauthorized aliens. Critically, IRCA defines what is an unauthorized alien, and that's 1324H3. And the definition there is very important because it excludes from unauthorized aliens LPRs as well as anyone granted work authorization either by the INA or by the Attorney General, now the Secretary. By carving out both authorization by the INA or the Attorney General, the statute makes very clear that there is an authority by the then Attorney General, now Secretary, to grant work authorization even if there is not a specific INA provision that grants work authorization. A year after IRCA, INS considered a petition for rulemaking. Someone was asking them to repeal their regulation on the grounds that the Attorney General didn't have authority to grant work authorization. The INS said, Congress just confirmed in IRCA that the Attorney General has this authority. That was in 1987. And Congress has not taken any steps to alter that understanding in the intervening years. And in fact, other provisions of the INA make clear that the Secretary has independent work authorization authority because it says in limited circumstances work authorization cannot be granted. Someone who's been detained and is released, 1226A3, says that that person can't be given work authorization by the Secretary. That would be unnecessary if there weren't some residual authority. Before your time runs out, I want to ask sort of a different question about the debate about the substantive power to do DACA. I don't think I saw anywhere any reference to the pardon power. Correct. I think that's because there's no argument here that the President could have done any of these things pursuant to the pardon power. We have not relied on the pardon power, Your Honor. The other aspect of DACA that is discussed although it's not actually part of the 2012 memo is lawful presence. There are certain statutes that say that individuals who are lawfully present can obtain benefits like Social Security. They're allowed to pay in and then receive Social Security. The 2012 DACA memo says nothing about lawful presence. There's a statute that does, 1611B2. There's a regulation that governs Social Security. It's 8 CFR 1.3. But those have not been challenged by the plaintiffs in this case. They're challenging only the memo that says nothing about lawful presence. That's different from the 2014 DAPA memo that did discuss lawful presence. Here, the memo... Does that contradict what the Supreme Court said in Regents? Similar memos and... Actually, the same... Same memo. In my case, it's Regents on DACA, and it was described by the Supreme Court as not just a forbearance policy but an affirmative immigration rewrite, essentially. The court certainly acknowledged that there are benefits that flow from having deferred action status. But the point I'm making here is that the plaintiffs have not challenged these statutes and regulations that say that deferred action recipients generally are lawfully present. Their only challenge is to the DACA memo itself, and so there has to be something about granting deferred action to DACA specifically that they're challenging. And they rely a lot on the DAPA decision from this court, but as this court noted in that case, that was a very different program than DACA. It was orders of magnitude bigger. It covered 4.3 million people, whereas DACA only covers... At most, the estimate is 1.5, and there are currently only 600,000. The memo expressly mentions work authorization. Correct. Work authorization is mentioned in a sentence. There's nothing about lawful presence in the memo. I'd like to turn very quickly, if I may, to severability. This is an issue that we raised in our brief that the plaintiffs have never responded to. If this court were to find that some aspects of DACA are lawful and some are unlawful, it should sever the unlawful portions and leave in place the lawful portions. That's uncontested in this case. And then finally, on 1252F1, there are just a couple of points to make. In the Aleman-Gonzalez decision, which was very recently issued, the Supreme Court changed its interpretation of 1252F1. It clarified at least the interpretation. And that's why we didn't raise 1252F1 until after Aleman-Gonzalez and then after the Biden v. Texas MPP decision that also relied on 1252F1. So we don't think there's a forfeiture issue because there's intervening precedent. If there were a forfeiture issue, we think the court below, if the district court has decided this in the first instance... I'm not sure I understand that forfeiture argument. I mean, even when... I'm trying to think of how many cases we have, but there are literally hundreds where parties know that a case is foreclosed... an argument, sorry, a claim or argument is foreclosed by a Supreme Court president. They make it anyway, specifically to preserve the argument in the event the Supreme Court takes cert. So I don't understand that. So I think that the district court at least would have within its discretion to waive any forfeiture if there were a forfeiture concern here because of the intervening... Okay, but that would be a little ticklish for us to not find your argument forfeited when you just said earlier that the state of Texas' argument about driver's license is forfeited. Well, there's the... I assume you agree we have to apply the same principles to both sides of the V. So there are at least a couple of differences, Your Honor. One is Texas isn't asserting driver's license standing now and hasn't put in any evidence in the record. That's an evidence-based argument. It was their burden at summary judgment to put in the evidence. They haven't done it. Second, there's been no intervening change in the law. In fact, there was a 2015 decision they could have relied on. And then third, this is a jurisdictional provision. The Supreme Court made clear in the Biden v. Texas case that it didn't affect the district court's jurisdiction to hear the entire case and thus didn't affect the Supreme Court's jurisdiction, but it is a jurisdictional provision with respect to the remedy. And the Supreme Court left open the question of whether it's forfeitable. That's footnote four of the MPP decision, leaves that open. If that's an issue this court is interested in and we think it is a jurisdictional issue, we would be happy to provide briefing on that specific question. If the court has no further questions, I see I've exceeded my time, and I appreciate your patience very much. Thank you, counsel. We have your argument. That will conclude.